STEPHEN YAGMAN (SBN 69737)
filing@yagmanlaw.net
(for court filings only)
YAGMAN + REICHMANN, LLP
333 Washington Boulevard
Venice Beach, California 90292-5152
(310)452-3200

Presented on behalf of Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| J.L. BOYD,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT LUNA, KATHRYN BARGER, JANICE HAHN, HOLLY MITCHELL, HILDA SOLIS, LINDEY HORVATH, and 10 UNKNOWN NAMED DEFENDANTS, 1-10,<br><br>Defendants. | **COMPLAINT**<br><br>(Police Brutality and Thuggery, "Horrific" Mens' Central Jail Conditions, for Damages for Civil Rights Violations, 42 U.S.C. § 1983, and for RICO Violations)<br><br>**JURY DEMAND**<br><br>**CLASS ACTION ALLEGATIONS** |

Plaintiff makes the following allegations, in support of the this complaint:

## JURISDICTION AND VENUE

1. Plaintiff, **J.L. BOYD**, is a Black person who asserts federal claims, under 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3), and 18 U.S.C. § 1961-64 (RICO) against defendants, subject matter jurisdiction lies pursuant to 28 U.S.C. §§ 1331 and 1343 of the federal claims, and defendants' conduct affects and interferes with interstate commerce.

2. The matters that are the bases for this action occurred in Los Angeles County, California, in the Mens' Central Jail, and therefore venue lies in the United States District Court for the Central District of California, and in its Western Division, pursuant to 28 U.S.C. § 1391.

## THE PARTIES

3. Plaintiff is a Black, disabled United States Marine Corps, combat veteran, who spent 26 months deployed in the Middle East, who has been subjected to police brutality and thuggery, and defendants are **ROBERT LUNA, KATHRYN BARGER, JANICE HAHN, HOLLY MITCHELL, HILDA SOLIS,  LINDEY HORVATH,** and **10 UNKNOWN NAMED DEFENDANTS,** who all are County of Los Angeles officials, who participated in, or who approved of, condoned, acquiesced in, ratified, or who are otherwise legally responsible for the wrongful acts alleged hereinbelow, and whose conduct is culpable, and whose unknown names will be replaced by their true identities when those true identities are learned, or are persons and/or entities whose true names presently are unknown, and who may have engaged in some conduct that is culpable with respect to plaintiff, as set forth hereinbelow. All defendants acted under color of law, and all engaged in the same wrongful conduct, by participating in, facilitating, and making the decisions that resulted in the wrongs hereinbelow alleged, or who are officials who made official County policy, or who are responsible for the County's jail customs, or who ratified decisions that deprived plaintiff of his constitutional rights.

4. Defendants, each and all are sued in both their individual and official capacities, when they have an official capacity, but only in their official capacities, for the claims made under *Monell v. Dep't of Soc. Svcs. of the City of New York*, 436 U.S. 657 (1978), with respect to which defendants are sued in their official

capacities only, and in their individual capacities only for the RICO violations hereinbelow alleged.

5. Plaintiff is a person who has been brutalized and thugged and subject to both constitutional violations and RICO violations by defendants.

6. Defendants and each of them played some material role in the acts and/or omissions alleged hereinbelow, and in the setting of policies of the County as to its jails, and their unconstitutional policies, practices, procedures, and customs were the moving forces behind the constitutional violations inflicted on plaintiff.

## ALLEGATIONS COMMON TO EACH COUNT

7. Each and every allegation set forth in each and every averment herein is incorporated by this reference in each and every other averment and allegation of this pleading.

8. All acts and/or omissions perpetrated and/or engaged in by each defendant, in their individual capacities, were done maliciously, callously, oppressively, wantonly, recklessly, with deliberate indifference to the rights allegedly violated, despicably, with evil motive and/or intent, in disregard of the rights of plaintiffs and class members, and in clear violation of the federal Constitution and of the California Constitution, and of controlling federal law, both statutory and common law, as set forth by both the United States Supreme Court and the United States Court of Appeals for the Ninth Circuit.

9. The plaintiff in this action, over the past four years, has suffered from was injured by intolerably bad conditions at the Los Angeles County Men's Central Jail, and they included the following:

a. Bad plumbing, with broken toilets in his numerous cells, over-flowing with urine and feces, all over the floors in his cells, which sometimes went on and destroyed his property and belongings, and which he had to clean-up himself, with limited cleaning supplies and blankets from his bed.

3

b. Roaches were all over his cells that he lived in, which he had to kill, and being woken up in the middle of the night, with roaches in his bed, crawling on him.

c. He filled out paperwork several times to move to the military dorm in the jail, where there are inmates who served in the military, like him, but he never was  put there, and instead, he was put in gang modules, where he was labeled "non-affiliate," was beaten-up by gang members, had his belongings stolen by gang members, and treated like shit, with him not being from Los Angeles.

d. He is a Marine Corps veteran, who is disabled, with nerve damage in his whole right arm and he filled-out paperwork to go to a medical dorm, but was never taken there and was left in a gang module, where he got beaten-up by gang members, and I had to defend myself with one arm.

e. There were several times that he went without eating dinner, because they didn't feed us.

f. He had to pay for telephone time his during the first four years in the Jail, and there were three times when the deputy sheriff guards switched his telephone pin for gang members, who used up all the time that he had pre-paid for.

g. When he was in the 4700 Module, all the cell doors could be opened by the inmates using a "walking cane," and gang members would come fight each other in his cell: Crips vs. Bloods.

h. When he left the 4700 module, the gang members tried to drag him back in and jumped him, and where there should have been video surveillance there was not, so that when they all opened the cells the gang members came after him and beat him up.

//

i. There were times when he told deputy guards that he didn't feel comfortable in the cells that he was in, getting beaten up and having all of his belongings stolen, and they laughed at him me and said "Don't come to jail then," and walked away.

j. He would make curtains for his cells to block himself when he used the bathroom, giving him privacy when he defecated, and the deputies would yank them down so everyone could see him, using the bathroom, taking a shit.

k. When he first got in jail, he bought several legal books, to study for his case, that were very expensive -- the California Penal Code book, the California Policies and Procedures in the Court Room, the California Jury Instructions, the Webster Law Dictionary, and the Black's Law Dictionary, around $900 in books, and the deputies came in and raided the cells in the module, where they completely trashed the cells and messed up inmates' personal belongings, which included his expensive law books, that they destroyed.

10. The non-HPD defendants each and all are legally liable for all of the conduct set forth in averment 9 because, with deliberate indifference, they caused it, ratified it, condoned it, acquiesced in it, or otherwise made it possible, by their actions and/or inactions, and caused and/or created Jail policies, practices, procedures, and/or customs, that caused the unconstitutional Jail conditions and conduct, and because all of them failed in their duty to train police in proper, allowable, constitutional policing and jail procedures, and their failures amounted to deliberate indifference to the rights of persons subjected to the "horrific" callousness and conditions in the Jail. The contents of the Los Angeles Times June 5, 2024 article "Inmate hung a noose. Jailers too busy watching 'explicit video' to intervene, inspectors say," Exhibit hereto, which report on the "horrific"

conditions in the Los Angeles County Mens' Central Jail, are incorporated herein by this reference.

## COUNT ONE
(Against All Defendants, 42 U.S.C. § 1983)

11. Plaintiff realleges specifically the allegations set forth in averments 9 & 10, hereinabove, and, by virtue thereof, all defendants are liable to plaintiff, pursuant to 42 U.S.C. 1983, for violation of plaintiff's Fourth, Eighth, and Fourteenth Amendment rights, not to be subjected to horrific jail conditions.

12. The County defendants are responsible for the these violations because they all set the policies and accepted the customs of the Jail, among which were unconstitutional, brutalization of citizens, and plaintiff herein was subjected to such brutalization and thuggery.

13. The County officials who are defendants are responsible for the constitutional violations they set the policies and accepted the customs of the Jail and Sheriff's Department that have been ratified, approved of, condoned, and acquiesced in by these defendants.

## COUNT TWO
(Against All Defendants for Conspiracy Under § 1983)

14. Plaintiff realleges specifically hereat the allegations set forth at averments nine through 13, hereinabove, and by virtue thereof, all defendants also are liable to plaintiff for conspiracy to violate his constitutional rights, pursuant to § 1983, because they had an agreement and/or understanding, that the wrongs perpetrated would be perpetrated, and then they were perpetrated, against plaintiff.

15. More specifically Supervisors and the Sheriff for many years have been aware of and permit and condone the conditions at the Jail, so that the Sheriff and they all feel free to violate the Constitution, and here did so, and approved of the Jail conditions, condoned them, acquiesced in them, and many times have ratified

1  them, with a meeting of their minds that this kind of unconstitutional conduct
2  would occur.

3      16. The Supervisors and the Sheriff all are well-aware the horrific Jail
4  conditions, and do nothing to correct them, and refuse to build a new Jail.

6                          **COUNT THREE**
7                        (Sec. 1983, *Monell*)

8      17. "[When] the complaint plausibly alleges a policy, custom, or practice
9  leading to that violation[, *s*]*ee Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct.
10 1937, 173 L.Ed.2d 868 (2009)[,] [and] Plaintiffs' allegations amount to . . . more
11 than an 'isolated or sporadic incident[ ]' that . . . forms the basis f *Monell* liability
12 for an improper custom. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir.
13 1996)." *Saved Magazine v. Spokane Police Dep't*, 19 F.4th 1193, 1201 (9th Cir.
14 2001). Herein, all defendants are liable to plaintiff because they had and have, and
15 foster, policies, practices, procedures, and customs that are constitutional
16 violations, which policies, *etc.*, in violation of the Constitution, were the moving
17 forces that caused the violations of the plaintiff's rights, as alleged herein.

18     18. Additionally, defendants for many years have been aware of and permit
19 and condone that they permit their Sheriffs to not properly administer the Jail, so
20 the successive Sheriffs feel free and licensed to violate the Constitution and here
21 did so, and these defendants have failed to investigate what occurred in this
22 matter, and to take action against the Sheriff, and  thereby approved of it,
23 condoned it, approved of it, and ratified it, with a meeting of their minds that this
24 would occur.

25     19. The Supervisor defendants are aware that the Sheriff customarily
26 violates prisoners' constitutional rights, and they have approved of such conduct
27 and condoned it and ratified it, as they have done in this instance.

28     20. This is their policy and custom, to do so.

### COUNT FOUR
(Against All Defendants Under § 1985(3))

21. Each defendant agreed and/or understood and conspired with at least one other defendant to deprive the plaintiff of the equal protection of the laws, in violation of 42 U.S.C. 1985(3), based on a racially-motivated bias against the plaintiff, and the official capacity defendants could have, but did not, prevent the violations of Section 1985(3).

22. Therefore, the Sheriff is liable to plaintiff under Section 1985(3), and the Supervisors, who had the power and/or opportunity and/or duty to prevent, but who failed to prevent any violation of Section 1985(3), are liable to plaintiff under 42 U.S.C.1986.

23. All official capacity defendants are liable to plaintiff for all wrongs alleged in this pleading pursuant to *Monell, supra.* This alleged conspiracy is separate from the simple, non-racially-based conspiracy alleged in Count Two, hereinabove.

### COUNT FIVE
(Against All Defendants Under § 1983)

24. Defendants have engaged in conduct to cover-up the horrible Jail conditions, and thereby interfered with plaintiff's federal constitutional right of access to the federal courts.

### COUNT SIX
(Violation of *Jus Cogens* International Law)

25. Defendants' actions, as set forth hereinabove, are in clear violation of and are prohibited by the *jus cogens,* peremptory norms of international law that, among other things, prohibit unlawful takings into custody by government.

26. Such *jus cogens,* peremptory norms are the law of the land in the United States of America, and plaintiff and class members are entitled to damages for the harm caused to them by defendants' violations of *jus cogens*, peremptory norms,

1   and to declaratory and injunctive relief, because the Ninth Circuit, in *Siderman v.*

2   *Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992), has held these prohibitions to

3   be *jus cogens* norms.  That is, plaintiff and class members claim defendants are

4   liable to plaintiff and class members for subjecting them unlawful detentions, in

5   violation of *jus cogens* peremptory norms of international law, whose violation, in

6   turn, is a violation of the law of the United States of America, under the

7   Supremacy Clause of the United States Constitution.

8

9                              **COUNT SEVEN**

10               (Violation of *Jus Dispositivum* International Law)

11       27. Defendants' actions, as set forth hereinabove, are in clear violation of the

12   *jus dispositivum* treaty obligations entered into by the United States of America,

13   and which obligations, pursuant to Article VI, Clause 2 of the United States

14   Constitution (the Supremacy Clause), are "the supreme law of the land . . . any

15   thing in the Constitution or laws of any state to the contrary notwithstanding."

16       28. The specific treaties whose provisions prohibit unlawful detentions and

17   cruel and unusual  punishments, to which the United States of America is a

18   signatory, and whose provisions were violated by defendants, are:  Universal

19   Declaration of Human Rights, G.A. Res. 217 (A) (III), U.N. Doc. A/810 at 71

20   (1948); the Declaration on the Protection of All Persons from Being Subjected to

21   Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A.

22   Res. 3452 (1975); Convention Against Torture and Other Cruel, Inhuman or

23   Degrading Treatment or Punishment, G.A. Res. 39/46, annex 39 U.N. GAOR

24   Supp. (No. 51) at 197, U.N. Doc. A/39/51, art. 1 (1984); Body of Principles for the

25   Protection of all Persons under Any Form of Detention or Imprisonment, G.A.

26   Res. 43/173, 43 U.N. GAOR Supp. (No. 49), U.N. Doc. A/43/49, at 297, Principle

27   5 (1988); the American Convention on Human Rights, O.A.S. Treaty Series No.

28   36, at 1, OEA/Ser. L./V/II.23 doc. Rev. 2, Art. 5); International Covenant on Civil

and Political Rights, G.A. Res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, Art. 7; and, the European Convention for the Protection of Human Rights and Fundamental Freedoms, 213 U.N.T.S. 222, Art. 3, and by engaging in the conduct alleged, defendants violated those treaties and conventions, and thereby violated the laws of the United States of America, through the Supremacy Clause.

29.  By virtue of the violations of the provisions of these treaties, plaintiff and class members are entitled to recover nominal damages and punitive damages from defendants, and to declaratory and injunctive relief.

30.-142. Reserved.

### COUNT EIGHT
#### (Against All Defendants, RICO)

143.  By doing and/or attempting to do, the things alleged hereinabove, and/or by aiding or abetting them, defendants thereby engaged in and committed the related RICO predicate acts, with similar purposes, results, participants, victims, and methods of commission, over a long and continuing period of time, going back at least 10 years, with a threat of continued racketeering activity of obstruction of justice, and continue to commit obstruction of justice, all by using instrumentalities of interstate commerce to accomplish their crimes, and thereby are liable under the civil RICO statute.

### Rico Predicate Acts

144. **Fraud**: The fraud has occurred by defendants covering-up and attempting to cover-up the deplorable conditions at the Jail and failing and refusing to obey many, many court orders to remedy the "horrific" Jail conditions and making many misrepresentations to this court about the Jail conditions.

145. **Obstruction of Justice**: The obstruction of justice occurred by defendants inflicting constitutional violations on plaintiff and class members and

by preventing plaintiff and class members from exercising their federal constitutional rights, all as set forth hereinabove, and by disobeying orders of this court to remedy the Jail conditions, going back at least to 1975.

146.  Each defendant, in his/her own right, and all defendants together, collectively, as well as their employees, who work in and for the County are all enterprises and associated-in-fact enterprises, within the meaning of 18 U.S.C. 1961(4), and therefore they each and all are RICO enterprises.

147.  Each and all of defendants' activities affect interstate commerce, as well as intrastate and interstate travel.

148.  Each defendant received and receives income, directly and/or indirectly, by way of insurance premiums, salary, compensation, reimbursement for expenses, *per diem* costs reimbursements, meals, lodging, and/or travel, pensions, *etc.*, from the pattern of racketeering activity alleged herein, and used and uses that income in the acquisition of an interest in and/or operation of the enterprise, in violation of 18 U.S.C. 1962(a), and acquired and/or maintained control over said racketeering enterprise through a pattern of racketeering activities, as set forth herein, in violation of 18 U.S.C. 1962(b).

149.  Defendants conducted and/or participated, and continue to conduct and participate in, said enterprises' affairs through a pattern of racketeering activities, in violation of 18 U.S.C. 1962(c).

150. The pattern of racketeering activities included, and continues to include, a continuous pattern and practice potentially involving activities, including the RICO predicates of fraud, fraudulent concealment, and obstruction of justice, and defendants' defense of the instant action will continue to be and will be a continuation and a part of its RICO schemes, so that those who may participate in the defense of this action may make themselves liable under RICO.

151. Defendants' associated-in-fact enterprises constitute a present and continuing threat of harm and additional RICO violations.

152. The enterprises' activities have occurred on more than one, and on many occasions, over at least the past 50 years, and have been done on numerous occasions, and constitute at least a 1,000 separate acts, as set forth hereinabove, not including the acts that will be included as part of the defense of the instant action.

153. At least more than two RICO predicate acts have occurred.

154. The wrongful acts described in the matters enumerated hereinabove occurred over a significant period of time, and are related in that they evidence civil RICO predicates, including at least fraud and obstruction of justice, and they pose a threat of continued criminal activity, have the same or similar purposes, results, participants and kinds and categories of participants, victims, methods of commission, and are otherwise interrelated by their common characteristics and participants, they are not isolated events, but are both continuous and systemic, and each and all constitute a continuing pattern of racketeering activity and constitute a long term threat of continuing racketeering activity.

155. The activities led to defendants' control of and acquisition over the enterprises and resulted in the injuries to plaintiff and class members, as alleged herein, which resulted from defendants' participation in and control of the enterprises.

156. By failing to prevent the wrongful conduct herein alleged, misconduct that amounted to racketeering activities, all managerial and non-managerial employees and/or officers and/or agents of defendants engaged in and condoned racketeering activities.

157. The willful and/or negligent mismanagement of the enterprises, with knowledge by defendants charged with management, and potentially other

defendants, that they were and continue to be operated as a RICO enterprises, directly caused the harm to plaintiff and to class members, as alleged herein.

158. The enterprises are RICO enterprises because they have hierarchical structures and consensual structures for making decisions, and those structures have an existence beyond that which is necessary to commit the RICO predicate acts alleged herein, in that the hierarchical and consensual structures exist to accomplish doing business, and the structures for decision-making exist separate and apart from the racketeering activities.

159. Each defendant unlawfully conspired with others, including other defendants, by understanding and agreeing to do, and having a meeting of the minds, and taking overt actions to support the matters hereinabove alleged, to violate the provisions of 18 U.S.C. 1962(b), (c), and (d), and, continued and continue to do so ,with the aid and assistance of co-conspirators

160.-272. Reserved.

## CLASS ACTION ALLEGATIONS

273. Plaintiff is a member of a class, whose defining characteristics are that they are persons who were subjected to Fourth, Eighth, and Fourteenth Amendment violations at the hands of defendants, at the County Jail, because the physical conditions at the Jail are deplorable and "horrific."

274. The class contains more than 20,000 people, and the class is so numerous so that joinder of all members is impracticable.

275. There are only common questions of fact and of law with respect to all class members of each class.

276. The claims made by the representative party of the class, plaintiff, are typical of the claims of each class member.

277. The representative of the class, plaintiff, more than fairly, vigorously, and zealously will represent and adequately protect the interests of all class members, both themselves and through their very zealous attorney.

278. Prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to class members, which would establish incompatible standards for parties opposing the classes, and defendants have acted and will continue to act on grounds generally applicable to every class member in both classes, and the class questions not only predominate but are the only questions that exist, and this action is the far superior manner to other available methods for fairly and efficiently adjudicating the controversies.

279. Specifically, the class members' interests in individually controlling the prosecution or defense in separate actions do not exist, and there are no anticipated difficulties in managing this class action, especially as to identification of the amount of damages, identification of class members, and providing actual notice to virtually all class members.

280. Therefore, this action is maintainable under F.R. Civ. P. Rule 23(a), & 23(b)(1)(A),(B)(1), (2), and (3).

281. Although there would appear to be no notice requirement as to (B)(1) & (2) classes, the nature of the notice to be provided to class members would be decided by the court.

**WHEREFORE**, plaintiff requests relief against each defendant as follows:

1. Compensatory damages $1,000,000, and trebling under RICO;

2. Punitive damages on all non-*Monell* claims, in sums to be determined by a jury, and as a percentage of the net worth of each defendant, in sums sufficient to deter future misconduct, and not less than $10,000,000 per defendant;

4. The costs of action and interest;

5. Attorneys' fees; and,

6. Such other relief as is just and proper.

**JURY DEMAND**

Plaintiff demands trial by jury of all issues.

**YAGMAN + REICHMANN, LLP**

By:  /s/  Stephen Yagman
**STEPHEN YAGMAN**

15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT

CALIFORNIA

# Inmate hung a noose. Jailers too busy watching 'explicit video' to intervene, inspectors say



Inspectors at Men's Central Jail, shown in 2022, documented mold, mildew and inadequate food and water last month. They also found bugs coming out of the sinks, along with "small black worms." (Irfan Khan / Los Angeles Times)

**By Keri Blakinger**
Staff Writer

June 5, 2024 3 AM PT

When a pair of oversight inspectors walked up to one of the deputies' stations inside Men's Central Jail last month, they were already exasperated. During their visit to the

high-security unit, the inspectors later wrote in their report, they'd been concerned to
see a noose in one of the cells.

They were even more concerned when they realized a jailer had walked by for a safety
check and ignored it.

The first time an inspector approached the deputies to tell them about it, he said, the
eight jailers sitting in front of a television brushed him off. When he returned half an
hour later with another inspector, he realized why: The deputies were busy watching a
"sexually explicit" video, according to an oversight report published this month.

"The degree of callousness they were exhibiting was just horrific," said Eric Miller, one
of the two Sybil Brand Commission inspectors who wrote the report. "What's the
purpose of the security check if you're not actually taking any action?"

It was only after inspectors asked several deputies to intervene that one jailer finally
tore down the noose before the inmate harmed himself, the report said.

To Haley Broder, the inspector who accompanied Miller that day, the failure to act
seemed to be representative of larger problems she saw inside the decades-old facility.

"There was just continuous neglect and bad conditions," Broder told The Times this
week. "People were saying they were hungry. We saw people with giant open wounds.
The trash was just everywhere — there's so much trash. It smells. There are fires. And it
seems in general there is just a genuine lack of interest in changing that situation."

In an emailed statement, the Los Angeles County Sheriff's Department said it has
addressed several of the issues identified in the June report. Officials did not say
whether the deputies caught watching the video have been reassigned but told The
Times there is now an investigation underway.

CALIFORNIA

**6 inmates, 2 jailers hospitalized after 'toxic substance' exposure at women's jail in Lynwood**

June 5, 2024

"The department investigates all allegations of misconduct and expects its personnel to perform its responsibilities in a professional manner in accordance with department policy," the statement said. "When violations of policy and procedures are discovered, personnel are held accountable."

The latest problems in the jail came to light after Miller and Broder visited for a surprise inspection in mid-May. When they entered the first-floor high-security unit, the inspectors stopped to talk to a man who'd been let out of his cell to shower. As they talked, Miller said, they watched a deputy walk down the row to look inside each cell for a safety check. A few minutes later, Broder said, she peeked into the open cell of the man who'd come out to shower.

That's when she spotted the noose.

"Though unlikely to support the incarcerated person's weight, the noose was obvious to anyone looking into the cell," she and Miller wrote in their report.

While Miller went to find a deputy, Broder — a trained social worker — stayed behind to talk to the apparently suicidal man in the shower, who had by then started banging his head against the wall.

At first, Miller said, he went to the deputies' station, where he found eight jailers seated in front of a television.

"The deputies said they would check on the cell later," the inspection report said, "but remained seated watching the video on the television."

Eventually, Miller said, he tracked down the first deputy he'd spotted doing rounds, and convinced him to remove the noose.

After the commissioners finished inspecting the rest of the unit, they returned to discover the eight deputies were still sitting at their station watching a "sexually explicit video" on their television. When Miller walked in, he said, they didn't move to turn it off.

"To me it looked like the beginning of an OnlyFans video or something," Miller said. "It was women in underwear, and it certainly didn't look like they were going to put more clothes on. It looked like they were going to take them off."



CALIFORNIA

**Juvenile hall fight videos raise question: Can L.A. County probation reports be trusted?**

May 30, 2024

Officials did not respond to a question from The Times about what exactly the deputies were watching.

It was only when Broder walked in a few seconds after Miller that the deputies "hurriedly removed the video from the screen," the report said.

The report did not name the deputies involved.

The jails have long struggled to provide constitutionally adequate care and living conditions. The county is currently subject to four court-enforced settlement agreements stemming from federal lawsuits over poor treatment of inmates and bad living conditions.

The newest of those settlements dates back to 2015 when — after a rise in jail suicides — the U.S. Department of Justice took legal action against the county for failing to provide adequate treatment for severely mentally ill inmates. The oldest of the cases is focused on living conditions and dates back to the 1970s, but it still remains open because the Sheriff's Department has never fully complied with the terms of the settlement.

"Men's Central Jail is a rolling settlement agreement violation," Miller said. "And no one is willing to take responsibility."

Melissa Camacho concurred. She's an American Civil Liberties Union of Southern California senior staff attorney representing inmates in two of the ongoing federal lawsuits.

"Issues with safety checks and not notifying anyone that they saw a noose during a safety check have to be clear violations of the consent decree in the DOJ case," she said. "That case is focused on reducing the numbers of deaths by suicide, so to walk by a noose is beyond the pale."

On that same floor of the jail, inspectors spotted several other problems. Some cells had broken toilets or leaking pipes, and the housing areas were humid from the constant drip of leaking showers, the report said. Inmates complained of rats and cockroaches in their cells and food, and inspectors said they saw mildew on ceilings, showers and in cells.

"There was also a man whose cell was covered in mold and water and he was using his clothes to sop up the water," Broder said. "In that unit they don't have books, they don't have pens. They have absolutely nothing, and it's completely dark."

On the fourth floor of the jail, inspectors wrote that some cells had no cold water, so the inmates had rigged up a system to pass water from cell to cell using strings and plastic bottles. There was a "strong smell of fire burning" and "trash everywhere."

In multiple cells on that floor as well as on the first floor, the mattresses had chunks missing, an issue Camacho found particularly vexing. Over the last 50 years, the jails have repeatedly landed in legal trouble for failing to provide mattresses to all inmates, <u>forcing some to sleep on urine-soaked floors or chained to benches</u>.

"Having mattresses with chunks missing violates an order that has been in place since the 1970s," Camacho said. "It's assumed when the Sheriff's Department is ordered to give everybody a mattress it will be a complete mattress and not a partial mattress."

On the fifth floor, inspectors said, inmates were triple-bunked in a hot cell block where the air conditioners were filled with lint. There were bugs coming out of the sinks, the report said, along with "small black worms."

One person reported that there was "a sick inmate in the bunk above them whose defecation was falling into their bunk." The inmate told inspectors the deputies had ignored their requests to help the sick person.

In several housing areas throughout the jail, inspectors said, inmates complained there wasn't enough food, and the meals they did get were often cold or inedible. In one dorm, a man showed commissioners a carton of fully curdled milk he said he'd received that day. When inspectors talked to medical staff about it, one employee concurred that there "appeared to be insufficient food for the incarcerated people," <u>according to the report</u>.

In its statement, the Sheriff's Department did not address allegations about a lack of food but said that it had already resolved the cold water problem and that officials worked to have such issues "corrected as expeditiously as possible."

The department said that none of the inspectors reported a sick inmate during their visit, and that jail officials would contact the commission for further details. The

department also said that its own inspection this week did not reveal any black worms, and that the jail maintains a contract with an exterminator.

"The Sheriff's Department often says they don't have enough staff," Camacho said. "What the Sybil Brand Commission tour shows is that it isn't that there isn't enough staff — it's that they don't do their job. And in this case, it's that they were watching porn instead of doing their job."

## More to Read

**L.A. County deputy arrested for allegedly smuggling heroin into jail, sources say**

May 7, 2024



**Oversight inspectors accuse Sheriff's Department of retaliation after reports on jail fires**

May 2, 2024



**Why was 2023 such a deadly year in Los Angeles County jails? It depends on whom you ask**

March 26, 2024



 **Keri Blakinger**

Keri Blakinger covers the Los Angeles County Sheriff's Department. Before joining the Los Angeles Times in 2023, she spent nearly seven years in Texas, first covering criminal justice for the Houston Chronicle and then covering prisons for the Marshall Project. Blakinger was a 2024 Pulitzer Prize finalist in feature writing for For her insightful, humane portrait, reported with great difficulty, of men on Death Row in Texas who play clandestine games of "Dungeons & Dragons," countering their

extreme isolation with elaborate fantasy. Her work has appeared everywhere from the BBC to the New York Daily News, from Vice to the Washington Post Magazine, where her 2019 reporting on women in jail helped earn a National Magazine Award. She is the author of "Corrections in Ink," a 2022 memoir about her time in prison.