1  STEPHEN YAGMAN (SBN 69737)
   filing@yagmanlaw.net
2  YAGMAN + REICHMANN, LLP
   333 Washington Boulevard
3  Venice Beach, California 90292-5152
   (310) 452-3200
4
5  Attorneys for Plaintiff and Class Members

6

7

8             **UNITED STATES DISTRICT COURT**

9            **CENTRAL DISTRICT OF CALIFORNIA**

10                **WESTERN DIVISION**

11

| | |
|---|---|
| **J.L. BOYD, III,** | 2:24-cv-05716-SPG |
| Plaintiff, | **NOTICE OF MOTION AND MOTION FOR PRELIMINIARY INJUNCTION, MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION, IN SUPPORT THEREOF** |
| v. | |
| **ROBERT LUNA, *et al.*,** | |
| Defendants. | September 25. 2024 |
| | 1:30 p.m. |
| | Courtroom 5C |
| | Judge Sherilyn Peace Garnett |

19

20     **PLEASE TAKE NOTICE** that plaintiff moves the court to declare the

21  unconstitutionality, under the United States Constitution, of the conditions of

22  confinement in defendants' Los Angeles County Mens' Central Jail, to enjoin the

23  continuation of those conditions, and to close the Jail because the conditions of

24  confinement never can or will be remedies, and that oral argument will be heard as

25  set forth above, and that the instant motion is based on the ground that the

26  conditions of confinement are violative of both the Fourteenth Amendment and the

27  Eighth Amendment to the United States Constitution.

28

1       Motions for preliminary injunctions are exempted from the L.R. 7-3 meet

2 and confer condition precedent to filing motions, and, notwithstanding that, a L.R.

3 7-3 conference was held, more than two weeks before the instant motion will have

4 been filed, and no resolution of the issues raised by this motion was reached.

5

6                **YAGMAN ± REICHMANN,LLP**

7             By: _____

8                     **STEPHEN YAGMAN**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    Introduction..........................................................................................5

II.   Defendants' conduct is unconstitutional...........................................5

      a. The law........................................................................................5

      b. The facts.......................................................................................8

III.  Both declaratory relief and injunctive relief are warranted.........11

      A. Declaratory relief.....................................................................11

      B. Injunctive relief.........................................................................11

IV.   Conclusion.........................................................................................15

## Cases

*Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987) ............................... 12

*Associated General Contractors v. Coalition for Economic Equity,* 950 F.2d 1401, 1410 (9th Cir. 1991) ................................................................................ 15

*Boswell v. Sherburne*, 849 F.2d 1117, 1123 (8th Cir. 1988) ..................................... 9

*Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)............ 9

*County of Sacramento v. Lewis*, 523 U.S. 833, 850, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043 (1998)..................................................................................... 9

*DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 199-200, 109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989) ....................................................... 9

*Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ................ 13

*Farmer v. Brennan* ........................................................................................ 7

*Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir.1998)................................................ 8

*Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992) ........................................................................................................................ 8

*Johnson v. California State Board of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995) ............................................................................................................ 15

*Johnson v. State of California*, 207 F.3d 650, 656 (9th Cir. 2000) ......................... 8

*MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516 (9th Cir. 1993) ... 15

3

*Mathis v. Fairman*, 120 F.3d 88, 91 (7th Cir. 1997) .................................................. 9

*McKinney v. Anderson*, 924 F.2d 1500, 1507 (9th Cir.1991).................................. 8

*Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)...................................... 14

*Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) ........................................................ 12

*Payne for Hicks v. Churchich*, 161 F.3d 1030, 1040 (7th Cir.1998)........................ 9

*Porretti v. Dzurenda*.................................................................................................. 13

*Revere v. Mass. Gen. Hospital*, 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77
L.Ed.2d 605 (1983)................................................................................................. 9

*Stanley v. Univ. of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994)........ 15

*Thomas v. Cnty. of L.A.*, 978 F.2d 504, 511 (9th Cir. 1992) .................................. 13

*Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986)................................. 8

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)............................... 12

*Williams v. Edwards*, 547 F.2d 1206, 1212 (5th Cir. 1977) ..................................... 9

*Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991)
................................................................................................................................ 8

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) .......... 12

4

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff submits this memorandum of points and authorities in support of his motion for declaratory relief and the issuance of a preliminary injunction.

## I.
## INTRODUCTION

Plaintiff challenges his (and others, who are similarly-situated) conditions of confinement at the Los Angeles County Mens' Central Jail, as set forth in his declaration, attached hereto, and which conditions have existed, and not been corrected from time immemorial.

## II.
## DEFENDANTS' CONDUCT IS UNCONSTITUTIONAL.

### a. THE LAW.

Like *Les Misérables*, in 1862, in which Victor Hugo examined the nature of law and grace, and urban design, so too does this action address the fate of the poor who are housed in the Jail. To say that the Jail is, and for years has been, a "hell hole" would be an understatement. It has been under the supervision of this court since 1975, to no avail. *See Rutherford v. Pitchess*, 2:75-cv-04111-DDP (plaintiff's counsel herein is counsel for numerous intervenors in that action).

The Jail description and population are as follows:

| Jail Facility | Board of State & Community Corrections Rated Capacity | 2022 4th Quarter Average Daily Inmate Population |
|---|---|---|
| Men's Central Jail | **3,512** | **3,737** |

5

1

2

3    The Men's Central Jail is a Los Angeles County Sheriff's Department county

4    jail for men in Los Angeles, Los Angeles County, California, United States. Built

5    in 1963, it is one of the oldest county jails in California. The Men's Central Jail is

6    located at 441 Bauchet St., Los Angeles 90012. Wikipedia[1]

7    Located in: Los Angeles County Sheriff Men's Central Jail

8    Address: 441 Bauchet St, Los Angeles, CA 90012

9    Phone: (213) 974-4921

10    Hours:

11    Open 24 hours

12    Opened: 1963

13    Capacity: 5,276

14    Population: 4,300

15    Function: Prison

16    *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), 30 years ago set the standard

17    that still governs for prisoners' conditions of confinement:

18

19    The Constitution "does not mandate comfortable prisons," *Rhodes v.
      Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981),

20    but neither does it permit inhumane ones, and it is now settled that "the

21    treatment a prisoner receives in prison and the conditions under which he is

22    confined are subject to scrutiny under the Eighth Amendment," *Helling,* 509
      U.S., at 31, 113 S.Ct., at 2480. In its prohibition of "cruel and unusual

23    punishments," the Eighth Amendment places restraints on prison officials,

24    who may not, for example, use excessive physical force against prisoners.
      See *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156

25    (1992). The Amendment also imposes duties on these officials, who must

26    provide humane conditions of confinement; prison officials must ensure that
      inmates receive adequate food, clothing, shelter, and medical care, and must

27

28

---

[1] The Wikipedia entry for the Jail is attached hereto.

"take reasonable measures to guarantee the safety of the inmates," *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). See *\*833 Helling, supra,* 509 U.S., at 31–32, 113 S.Ct., at 2480; *Washington v. Harper,* 494 U.S. 210, 225, 110 S.Ct. 1028, 1038– 1039, 108 L.Ed.2d 178 (1990); *Estelle,* 429 U.S., at 103, 97 S.Ct., at 290. Cf. *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 198–199, 109 S.Ct. 998, 1004–1005, 103 L.Ed.2d 249 (1989).

*Farmer* has been supplemented by the following cases:

A deprivation of minimal civilized measures of life's necessities states a conditions of confinement claim under section 1983. *Frost v. Agnos*, 152 F.3d 1124, 1130 (9th Cir.1998) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992)).

Whether conditions of confinement constitute cruel and unusual punishment is assessed based on whether one was deprived of the minimal civilized measure of life's necessities. If so, a prison or jail official may be held liable if s/he acted with deliberate indifference to a substantial risk of serious harm. *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991).

The Eighth Amendment's ban on cruel and unusual punishments prohibits conditions of confinement that pose unreasonable threats to inmates' health. *McKinney v. Anderson*, 924 F.2d 1500, 1507 (9th Cir.1991).

Prison officials must provide prisoners with personal safety because it is a basic human need. *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986); *Johnson v. State of California*, 207 F.3d 650, 656 (9th Cir. 2000).

A pretrial detainee is a person between the status of free person and convicted prisoner. A pretrial detainee has not been found guilty of a crime and therefore may not be punished by the state. The detainee is protected by the Due Process Clause of the Fourteenth Amendment, and that protection is at least as great as the protection a convicted prisoner is afforded under the Eighth Amendment, and a detainee therefore is protected from the deliberate indifference of jail officers. *Payne for Hicks v. Churchich*, 161 F.3d 1030, 1040 (7th Cir.1998)

1    (citing *Bell v. Wolfish*, 441 U.S. 520, 535 & n. 16, 99 S.Ct. 1861, 1872 & n. 16, 60

2    L.Ed.2d 447 (1979); *Revere v. Mass. Gen. Hospital*, 463 U.S. 239, 244, 103 S.Ct.

3    2979, 2983, 77 L.Ed.2d 605 (1983)). *See also, Mathis v. Fairman*, 120 F.3d 88, 91

4    (7th Cir. 1997), *cert. denied*, 522 U.S. 1016, 118 S.Ct. 603, 139 L.Ed.2d 891

5    (1997).

6          When prison officials are deliberately indifferent to prisoners' health or

7    safety, they violate the Constitution. *Cortes-Quinones v. Jimenez-Nettleship*, 842

8    F.2d 556, 558 (1st Cir. 1988).

9          When the state takes a person into its custody and holds him there against

10   his will, the Constitution imposes upon the state a corresponding duty to assume

11   some responsibility for his safety and general well-being. *County of Sacramento v.*

12   *Lewis*, 523 U.S. 833, 850, 118 S.Ct. 1708, 1719, 140 L.Ed.2d 1043 (1998) (quoting

13   *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 199-200,

14   109 S.Ct. 998, 1005, 103 L.Ed.2d 249 (1989)).

15         Pretrial detainees are entitled to the same due process protection as ordinary

16   citizens who are not being detained. *Boswell v. Sherburne*, 849 F.2d 1117, 1123

17   (8th Cir. 1988).

18         The prohibition against cruel and unusual punishment is not limited to

19   specific acts directed at selected individuals, but is equally pertinent to general

20   conditions of confinement that may prevail at a prison. *Williams v. Edwards*, 547

21   F.2d 1206, 1212 (5th Cir. 1977).

22                              **b. THE FACTS.**

23         The predicate facts are set forth in the complaint and in the attached

24   declaration of the plaintiff, as follows:

25         The plaintiff in this action, over the past four years, has suffered from was

26   injured by intolerably bad conditions at the Los Angeles County Men's Central Jail,

27   and they included the following:

28

a. Bad plumbing, with broken toilets in his numerous cells, over-flowing with urine and feces, all over the floors in his cells, which sometimes went on and destroyed his property and belongings, and which he had to clean-up himself, with limited cleaning supplies and blankets from his bed.

b. Roaches were all over his cells that he lived in, which he had to kill, and being woken up in the middle of the night, with roaches in his bed, crawling on him.

c. He filled out paperwork several times to move to the military dorm in the jail, where there are inmates who served in the military, like him, but he never was  put there, and instead, he was put in gang modules, where he was labeled "non-affiliate," was beaten-up by gang members, had his belongings stolen by gang members, and treated like shit, with him not being from Los Angeles.

d. He is a Marine Corps veteran, who is disabled, with nerve damage in his whole right arm and he filled-out paperwork to go to a medical dorm, but was never taken there and was left in a gang module, where he got beaten-up by gang members, and I had to defend myself with one arm.

e. There were several times that he went without eating dinner, because they didn't feed us.

f. He had to pay for telephone time his during the first four years in the Jail, and  there were three times when the deputy sheriff guards switched his telephone pin for gang members, who used up all the time that he had pre-paid for.

g. When he was in the 4700 Module, all the cell doors could be opened by the inmates using a "walking cane," and gang members would come fight each other in his cell: Crips vs. Bloods.

h. When he left the 4700 module, the gang members tried to drag him back in and jumped him, and where there should have been video surveillance there was not, so that when they all opened the cells the gang members came after him and beat him up.

i. There were times when he told deputy guards that he didn't feel comfortable in the cells that he was in, getting beaten up and having all of his  belongings stolen, and they laughed at him me and said "Don't come to jail then," and walked away.

j. He would make curtains for his cells to block himself when he used the bathroom, giving him privacy when he defecated, and the deputies would yank them down so everyone could see him, using the bathroom, taking a shit.

k. When he first got in jail, he bought several legal books, to study for his case, that were very expensive -- the California Penal Code book, the California Policies and Procedures in the Court Room, the California Jury Instructions, the Webster Law Dictionary, and the Black's Law Dictionary, around $900 in books, and the deputies came in and raided the cells in the module, where they completely trashed the cells and messed up inmates' personal belongings, which included his expensive law books, that they destroyed.

Cmplt., Doc. 1, *loc. cit.*; Declaration of plaintiff, James L. Boyd, III, *loc. cit.*

### III.
## BOTH DECLARATORY AND INJUNCTIVE RELIEF ARE WARRANTED.
### A.  DECLARATORY RELIEF

"In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party[,] . . . [and a]ny such declaration

1  shall have the force and effect of a final judgment or decree and shall be
2  reviewable as such."  28 U.S.C. § 2201. Moreover, "[f]urther necessary or proper
3  relief based on a declaratory judgment or decree may be granted after reasonable
4  notice and hearing, against any adverse party whose rights have been determined
5  by such judgment."  28 U.S.C. § 2202.

6  　　　Here, based on the foregoing, plaintiff is entitled to the declaratory relief that
7  the conditions of confinement at the Los Angeles County Mens' Central Jail are
8  unconstitutional, and to injunctive relief.  *See infra.*

9  ### B.  PRELIMINARY INJUNCTIVE RELIEF

10  　　　"A plaintiff seeking a preliminary injunction must establish that he is likely
11  to succeed on the merits, that he is likely to suffer irreparable harm in the absence
12  of preliminary relief, that the balance of equities tips in his favor, and that an
13  injunction is in the public interest."  *Winter v. Natural Resources Defense Council,*
14  *Inc.*, 555 U.S. 7, 20 (2008) (citations omitted).  *See Munaf v. Geren*, 553 U.S. 674,
15  689-90 (2008); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987);
16  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982). Plaintiff is likely to
17  succeed on the merits, *see supra*, plaintiff is likely to suffer irreparable harm in that
18  plaintiff will have been deprived of and would continue to be deprived of
19  plaintiff's constitutional rights -- and ***a violation of a constitutional right always***
20  ***constitutes irreparable harm*** -- the rights not to be subjected to unconstitutional
21  conditions of confinement, in violation of both the Eighth Amendment's cruel and
22  unusual punishment clause and the Fourteenth Amendment's Due Process Clause,
23  the balance of equities tips decidedly in plaintiff's favor and against defendants,
24  and clearly a preliminary injunction is in the public interest, because ***it always is in***
25  ***the public's interest to have constitutional and lawful conditions of confinement***.
26  　　　As to preliminary injunctions, the Ninth Circuit held, in *Porretti v.*
27  *Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021), *inter alia*, that:

11

"A preliminary injunction is an extraordinary remedy never awarded as of
right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365,
172 L.Ed.2d 249 (2008). At the same time, however, federal courts "must
not shrink from their obligation to enforce the constitutional rights of all
persons, including prisoners." *Brown v. Plata*, 563 U.S. 493, 511, 131 S.Ct.
1910, 179 L.Ed.2d 969 (2011) (citation and internal quotation marks
omitted). Nor may federal courts "allow constitutional violations to continue
simply because a remedy would involve intrusion into the realm of prison
administration." *Id.*

To obtain a preliminary injunction, Porretti "must establish [1] that he is
likely to succeed on the merits, [2] that he is likely to suffer irreparable harm
in the absence of preliminary relief, [3] that the balance of equities tips in his
favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at
20, 129 S.Ct. 365. Where, as here, the government opposes a preliminary
injunction, the third and fourth factors merge into one inquiry. *Drakes Bay
Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).
. . .
Emotional injuries, psychological distress, and risk of suicide may constitute
irreparable harm. *See id.* at 797–98; *see also Thomas v. Cnty. of L.A.*, 978
F.2d 504, 511 (9th Cir. 1992) ("Plaintiffs have also established irreparable
harm, based on this Court's finding that the deputies' actions have resulted in
irreparable physical and emotional injuries to plaintiffs and the violation of
plaintiffs' civil rights.").

Prisoners, such as plaintiff Boyd, undoubtedly suffer emotional injuries,
psychological distress, and risk suicide by not being able to reside in the County
Jail under humane conditions of confinement, and this constitutes irreparable harm,
in violation federal civil rights. The court continued, in *Porretti*:

The third and fourth [*Winter*] factors of the preliminary-injunction test—
balance of equities and public interest—merge into one inquiry when the
government opposes a preliminary injunction. *See Drakes Bay*, 747 F.3d at
1092. The "balance of equities" concerns the burdens or hardships to [the
Plaintiff] compared with the burden on Defendants if an injunction is
ordered. *See Winter*, 555 U.S. at 24–31, 129 S.Ct. 365. The "public interest"
mostly concerns the injunction's "impact on nonparties rather than

parties." *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003) (citation omitted).

The district court then explained how an injunction was in the public's interest: "The public has an interest in ensuring the continued dignity of [individuals] incarcerated in federal prisons" and "[i]nherent in that dignity is the recognition of serious medical needs, and their adequate and effective treatment" pursuant to the Eighth Amendment's mandated standard of care. We see no abuse of discretion here. *See Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("*[I]t is always in the public interest to prevent the violation of a party's constitutional rights.*") (citation omitted); *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) ("Generally, *public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.*").

(Emphases added.)

In this, the Ninth Circuit, a party may obtain injunctive relief in the form of a preliminary injunction by satisfying one of two, alternative tests.

The traditional injunctive relief test requires that there be "(1) a strong likelihood[2] of success on the merits [as here there is], (2) the likelihood of irreparable injury to a plaintiff if the preliminary relief is not granted [as here there is], (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest[] [as here there is]." *Johnson v. California State Board of Accountancy*, 72 F.3d 1427, 1430 (9th Cir. 1995). The public interest is the most important factor, and it would be irreparably harmed were the inhumane conditions of confinement to continue for another day.

Under the so-called "alternative test," a party seeking injunctive relief must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury, *or* (2) that serious questions are raised and the

---

[2] *Winter* did not change this injunctive relief standard, and it arguably reduced the "*strong* likelihood" standard to merely "likely to succeed on the merits." Plaintiff has met both standards.

balance of hardships tips sharply in the moving party's favor. *Stanley v. Univ. of Southern California*, 13 F.3d 1313, 1319 (9th Cir. 1994). Both of these tests here are met, and then some.

Taken as a whole, these requirements construct "a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516 (9th Cir. 1993) (citations and internal quotation marks omitted). Conversely, *mutatis mutandis*, and/or by *modus tollens*, as the probability of success increases, the required degree of irreparable harm decreases. *See id.*

Under the test for injunctive relief, a moving party must show that there is a fair chance of success on the merits. *Stanley,* 13 F.3d at 1319, as here plaintiff has shown. Likewise, "[u]nder either formulation of the test, a party seeking an injunction must demonstrate that it will be exposed to some significant risk of irreparable injury." *Associated General Contractors v. Coalition for Economic Equity,* 950 F.2d 1401, 1410 (9th Cir. 1991). That, too, has been shown.

Defendants are acting and continue to act without any legal authority and contrary to controlling legal authority, and have continued and will continue to have their inhumane conditions of confinement .

Plaintiff has demonstrated that plaintiff is entitled to a preliminary injunction.

## IV.
## CONCLUSION

For each and all of the reasons set forth, plaintiffs should be granted declaratory relief and a preliminary injunction, as set forth in the proposed order that is lodged concurrently herewith.

//

//

//

14

1

Respectfully submitted,

2
YAGMAN + REICHMANN, LLP

3

4
By: _____
        STEPHEN YAGMAN

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15

# CERTIFICATE OF COMPLIANCE

(L.R. 11-6.2)

The undersigned, counsel of record for plaintiff(s) certifies that this brief contains 2,970 words, which complies with the word limit of L.R. 11-6.1.


**YAGMAN + REICHMANN, LLP**

By: _____
    **STEPHEN YAGMAN**

16

### <u>DECLARATION OF JAMES L. BOYD III</u>

I, JAMES L. BOYD III, declare the following to be true under the penalty of perjury at Los Angeles, California, pursuant to 28 U.S.C. § 1746, on the date set forth below my signature hereinbelow.

1. I am the plaintiff in this action.

2. Over the past four years, I have suffered and was injured by intolerably bad conditions at the Los Angeles County Men's Central Jail, and they included the following:

3. Bad plumbing, with broken toilets in my numerous cells, over-flowing with urine and feces, all over the floors in my cells, which sometimes went on and destroyed my belongings, and which I had to clean up myself, with limited cleaning supplies and blankets from my bed.

4. Roaches were all over my cells that I lived in, which I had to kill, and being woken up in the middle of the night, with roaches in my bed, crawling on me.

5. I filled out paperwork several times to move to the military dorm in jail, where there are inmates who served in the military, like me. But I never was put there. Instead, I was put in gang modules, where I was labeled "non-affiliate," was beaten-up by gang members, had my belongings stolen by gang members, and treated like shit with me not being from Los Angeles.

6. I am a Marine Corps veteran, who is disabled, with nerve damage in my whole right arm and I filled-out paperwork to go to a medical dorm, as well. But I was never taken there and I was left in a gang module, where I got beaten-up by gang members, and I had to defend myself with one arm.

7. There were several times that I went without eating dinner because they didn't feed us in here.

1

2

3    JAMES L. BOYD III        AUG 2 6 2024

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



# WIKIPEDIA
### The Free Encyclopedia

# Men's Central Jail

**Men's Central Jail** is a <u>Los Angeles County Sheriff's Department</u> county jail for men in <u>Los Angeles</u>, <u>Los Angeles County, California</u>, United States. Built in 1963, it is one of the oldest <u>county jails</u> in California. The Men's Central Jail is located at 441 Bauchet St., Los Angeles 90012. The Men's Central Jail houses men who are awaiting trial or who have been convicted of crimes.

The Men's Central Jail is considered one of the largest jails in the world.[2][3][4][5][1][6] In May 2013, along with the adjacent <u>Twin Towers Correctional Facility</u>, Men's Central Jail was ranked as one of the ten worst prisons in the United States, based on reporting in *Mother Jones* magazine.[7]

On July 7, 2020, the Los Angeles County Board of Supervisors voted 4–0 to pursue a plan to close the Men's Central Jail within 12 months.[8] In voting to eventually close the 57-year-old facility, county supervisors said they wanted to focus on community-based programs to treat mental health challenges of those entering and exiting the jail system administered by the Los Angeles County Sheriff's Department. The vote came amid deliberate inmate reductions during <u>outbreaks</u> of <u>COVID-19</u> and the <u>Black Lives Matter</u> movement <u>protests</u> over police violence and the <u>murder of George Floyd</u>.[9]

## Construction and population

The construction of the Men's Central Jail was finished in 1963. The original building was designed to house 3,323 inmates.[10] In 1976, an addition was added to the structure at the cost of $35 million,[11] and by December 1990, inmate capacity was 5,276.[12]

Men's Central Jail has severe <u>overcrowding</u>, leading to problems such as inmates lacking shower facilities, very short recreation times out of their cells, wearing dirty clothes for up to a week, and inmates sleeping on floors for extended periods of time.[13][14][15] In March 1997, the inmate

### Men's Central Jail (MCJ)



| | |
|---|---|
| **Location** | Los Angeles, California |
| **Coordinates** | 34.0590°N 118.2321°W |
| **Status** | Operational |
| **Security class** | Minimum–Maximum |
| **Capacity** | 5,276 |
| **Population** | 4,300[1] |
| **Opened** | 1963 |
| **Managed by** | Los Angeles County Sheriff's Department |
| **Website** | website (https://locator.la county.gov/lac/Location/ 3039766/los-angeles-co unty-sheriff---mens-centr al-jail) |

population was about 13,000,[16] and saw similarly high numbers by June 2015, where the inmate population was about 17,000[1] and increased to 19,000 by August, where the legal limits on the jail population were only for 15,000 inmates.[14]

## Notable inmates

- Chris Brown, recording artist[17]
- Suge Knight[18]
- Todd Bridges, actor, *Diff'rent Strokes*[19]
- Drakeo the Ruler, rapper[20]
- Sean Penn, actor[21]
- Richard Goldberg, sex offender[22]
- Kelsey Grammer, actor[21][23]
- Richard Pryor, comedian[21]
- Tommy Lee, Mötley Crüe's drummer[21]
- Scott Weiland[21]
- Erik Menéndez[23]
- Richard Ramirez[21]
- O. J. Simpson[24][21]
- Shorty Rossi, reality TV personality[25]
- YG (rapper)[26]
- Ron Jeremy, pornographic actor[27]
- Harvey Weinstein, former film producer[28]
- Edward Furlong, actor[29]
- Danny Masterson, former actor[30]

# Services

Men's Central Jail provides some services to its inmates. Inmates can attend self-help classes on domestic violence, alcohol abuse, and substance abuse. Religious services are provided to inmates in the wake of several ACLU lawsuits.[31][32] As of 2004, selected inmates can earn a GED while incarcerated.[33]

# Violence and lawsuits

The ACLU has sued Men's Central Jail for major civil rights violations.[34][35][36][37][38] The United States Department of Justice has also sued the Men's Central Jail.[39][40][41][42]

In 2013, federal prosecutors charged 18 Sheriff's Deputies with excessive use of force.[43][44][45][46] In June 2015, Los Angeles Sheriff's Deputies were found guilty of beating a handcuffed man at the Men's Central Jail.[47][48][49][50]

# See also

- Rikers Island (New York City)
- Cook County Jail (Chicago)
- Harris County, Texas jails (Houston)

# References

1. Sewell, Abby (9 June 2015). "County supervisors vote to reconsider size of new Men's Central Jail" (https://www.latimes.com/local/lanow/la-me-ln-county-jail-plan-20150609-story.html). *Los Angeles Times*. Retrieved 24 August 2015.
2. Medina, Jennifer (28 September 2011). "Report Details Wide Abuse in Los Angeles Jail System" (https://www.nytimes.com/2011/09/28/us/aclu-suit-details-wide-abuse-in-los-angeles-jail-system.html). *The New York Times*. Retrieved 4 August 2015.
3. Don Thompson, Associated Press (2 February 2015). "Infographic: County jail populations across California dip after Prop 47 - 89.3 KPCC" (http://www.scpr.org/news/2015/02/02/49608/county-jail-populations-across-california-dip-afte/). *Southern California Public Radio*. Retrieved 4 August 2015.
4. Ucar, Ani (18 November 2014). "In the Gay Wing of L.A. Men's Central Jail, It's Not Shanks and Muggings But Hand-Sewn Gowns and Tears" (https://www.laweekly.com/in-the-gay-wing-of-l-a-mens-central-jail-its-not-shanks-and-muggings-but-hand-sewn-gowns-and-tears/). *LA Weekly*. Retrieved 4 August 2015.
5. "Cell breakouts, attacks 'easy' in outdated Men's Central Jail" (http://abc7.com/archive/9453411/). *ABC7 Los Angeles*. Retrieved 4 August 2015.
6. "At least one inmate stabbed in riot at Los Angeles jail" (https://www.reuters.com/article/us-usa-jailriot-losangeles-idUSKBN0OJ2UR20150603). *Reuters*. 3 June 2015. Retrieved 4 August 2015.
7. James Ridgeway and Jean Casella (8 May 2013). "America's 10 Worst Prisons: LA County" (https://www.motherjones.com/politics/2013/05/10-worst-prisons-america-la-county-jail-twin-towers). *Mother Jones*. Retrieved 4 August 2015.
8. "LA County Votes To Initiate Plan To Close Men's Central Jail Within The Year" (https://losangeles.cbslocal.com/2020/07/07/mens-central-jail-downtown-la-county-closed/). *Losangeles.cbslocal.com*. 2020-07-07. Retrieved 2020-07-10.
9. "L.A. County seeks plan to close aging Men's Central Jail in a year" (https://www.latimes.com/california/story/2020-07-07/mens-central-jail-closure-plan). *Los Angeles Times*. 2020-07-08. Retrieved 2020-07-10.
10. "LA's Men's Central Jail plagued by overcrowding, unsanitary conditions, violence" (https://www.scpr.org/news/2010/05/05/14795/las-mens-central-jail-plagued-overcrowding-unsanit/). *Southern California Public Radio*. 5 May 2010. Retrieved 24 August 2015.
11. Villacorte, Christina (28 August 2017). "Upkeep is proving costly as Men's Central Jail shows its age" (https://www.dailynews.com/2011/12/12/upkeep-is-proving-costly-as-mens-central-jail-shows-its-age/). *Los Angeles Daily News*. Retrieved 24 August 2015.

12. "L.A. COUNTY'S CENTRAL JAIL : Overcrowding and Age Burden Facility" (https://www.latimes.co
    m/archives/la-xpm-1990-12-16-mn-9280-story.html). *Los Angeles Times*. Retrieved 24 August
    2015.

13. "ACLU Criticizes Jail Overcrowding" (https://www.latimes.com/archives/la-xpm-1997-03-14-me-38
    194-story.html). *Los Angeles Times*. Retrieved 24 August 2015.

14. Villacorte, Christina (28 August 2017). "Men's Central Jail overcrowding crisis could cost $1.7
    billion to fix" (https://www.dailynews.com/2014/06/21/mens-central-jail-overcrowding-crisis-could-c
    ost-17-billion-to-fix/). *Los Angeles Daily News*. Retrieved 24 August 2015.

15. "ACLU calls Men's Central Jail a dungeon, seeks closure" (https://www.dailynews.com/2009/04/1
    5/aclu-calls-mens-central-jail-a-dungeon-seeks-closure/). *Los Angeles Daily News*. 15 April 2009.
    Retrieved 24 August 2015.

16. "ACLU Demands Meeting as Jail Crowding Soars" (https://www.latimes.com/archives/la-xpm-1997
    -03-01-me-33735-story.html). *Los Angeles Times*. Retrieved 24 August 2015.

17. Breuer, Howard (17 March 2014). "Chris Brown Ordered to Remain in Jail" (https://people.com/cri
    me/chris-brown-ordered-to-remain-in-jail/). *People*. Retrieved 5 August 2015.

18. Susman, Gary (26 February 2003). "Suge Knight is released from jail" (https://ew.com/article/200
    3/02/26/suge-knight-released-jail/). *Entertainment Weekly*. Retrieved 5 August 2015.

19. Timnick, Lois (10 November 1989). "Mistrial Declared in Bridges' Assault Case" (https://www.latim
    es.com/archives/la-xpm-1989-11-10-me-1148-story.html). *Los Angeles Times*. Retrieved 5 August
    2015.

20. "Drakeo the Ruler: Thank You for Using GTL" (https://pitchfork.com/reviews/albums/drakeo-the-rul
    er-thank-you-for-using-gtl/). *Pitchfork*.

21. LeDuff, Charlie (16 November 2002). "A Celebrity Home That's Not on the Star Maps" (https://ww
    w.nytimes.com/2002/11/16/us/a-celebrity-home-that-s-not-on-the-star-maps.html). *New York
    Times*. Retrieved 12 April 2020.

22. Dobruck, Jeremiah (2024-05-30). "Notorious sexual predator released from prison, immediately
    rearrested by Long Beach police" (https://lbpost.com/news/crime/richard-steve-goldberg-most-wa
    nted-arrested-released-long-beach/). *Long Beach Post News*. Retrieved 2024-07-11.

23. Miller, Samantha (22 December 1997). "The Party's Over" (https://people.com/archive/the-partys-
    over-vol-48-no-25/). *People*. Retrieved 5 August 2015.

24. LeDuff, Charlie (20 November 2002). "Room 7201: celebrity confinement California style" (https://
    www.theguardian.com/world/2002/nov/21/usa). *The Guardian*. Retrieved 5 August 2015.

25. Rossi, Shorty (2012-01-10). *Four Feet Tall and Rising* (https://books.google.com/books?id=MOk5
    DQd59w4C&q=shorty+rossi+%22men%27s+central+jail%22&pg=PA64). ISBN 9780307985897.
    Retrieved 5 August 2015.

26. YG arrested on robbery charges after Los Angeles home raid (https://www.cnn.com/2020/01/24/e
    ntertainment/yg-arrested/index.html) Marianne Garvey and Stella Chan, CNN, January 24, 2020

27. "LASD Inmate Information Center - Booking Details" (https://app5.lasd.org/iic/details.cfm).
    *App5.lasd.org*.

28. Vasquez, Whitney (2021-07-20). "Harvey Weinstein Jumps Off Private Jet Without Handcuffs,
    Disgraced Mogul Arrives To Los Angeles In Style Following Extradition" (https://radaronline.com/p/
    harvey-weinstein-extradition-los-angeles-photos-private-jet-no-handcuffs/). *RadarOnline*.
    Retrieved 2024-07-11.

29. "Edward Furlong sentenced to 6 months in jail over probation violation" (https://www.today.com/ne
    ws/edward-furlong-sentenced-6-months-jail-over-probation-violation-1C8710418). *Today.com*.

30. Schladebeck, Jessica (June 3, 2023). "Danny Masterson awaits sentencing in 'segregation' for safety" (https://web.archive.org/web/20230605011254/https://www.nydailynews.com/snyde/ny-dan ny-masterson-awaits-rape-sentencing-jail-segregation-safety-20230603-imvhm2plprf43mkvndtyus zbky-story.html). *New York Daily News*. Archived from the original (https://www.nydailynews.com/s nyde/ny-danny-masterson-awaits-rape-sentencing-jail-segregation-safety-20230603-imvhm2plprf 43mkvndtyuszbky-story.html) on June 5, 2023. Retrieved June 7, 2023.

31. Himes, Thomas (28 March 2014). "ACLU says Muslim inmates in L.A. jails not treated equally" (htt ps://www.dailynews.com/2014/03/28/aclu-says-muslim-inmates-in-la-jails-not-treated-equally/). *Los Angeles Daily News*. Retrieved 4 August 2015.

32. Chang, Cindy (26 July 2014). "Under new rules, Muslim inmates in L.A. County jails observe Ramadan" (https://www.latimes.com/local/la-me-adv-jail-ramadan-20140727-story.html). *Los Angeles Times*. Retrieved 4 August 2015.

33. Ricci, James (7 April 2004). "Gay Jail Inmates Get Chance to Learn" (https://www.latimes.com/arc hives/la-xpm-2004-apr-07-me-jail7-story.html). *Los Angeles Times*. Retrieved 24 August 2015.

34. "ACLU report: L.A.'s Men's Central Jail 'nightmarish' " (https://www.dailynews.com/2009/04/14/acl u-report-las-mens-central-jail-nightmarish/). *Los Angeles Daily News*. 29 August 2017. Retrieved 4 August 2015.

35. Leonard, Jack; Faturechi, Robert (19 January 2012). "L.A. County Sheriff's Department sued by ACLU" (https://www.latimes.com/local/la-xpm-2012-jan-19-la-me-jails-aclu-20120119-story.html). *Los Angeles Times*. Retrieved 4 August 2015.

36. Stoltze, Frank (5 May 2010). "ACLU: LA County jail guards perpetuate violence" (https://www.scpr. org/news/2010/05/05/14828/aclu-says-la-county-jail-guard-perpetuate-violence/). *Southern California Public Radio*. Retrieved 4 August 2015.

37. Vogel, Chris (19 May 2011). "Men's County Jail Visitor Viciously Beaten by Guards" (https://www.l aweekly.com/mens-county-jail-visitor-viciously-beaten-by-guards/). *LA Weekly*. Retrieved 4 August 2015.

38. "LA County Jails" (https://www.aclu.org/feature/la-county-jails). *American Civil Liberties Union*. Retrieved 4 August 2015.

39. Southern California Public Radio (4 August 2015). "Source: LA Sheriff agrees to new reforms at jails, settles civil DOJ lawsuit" (http://www.scpr.org/news/2015/08/04/53566/la-sheriff-agrees-to-ne w-reforms-at-jails-settles/). *Southern California Public Radio*. Retrieved 4 August 2015.

40. Southern California Public Radio (6 June 2014). "Los Angeles County's jails operating under unconstitutional conditions, says Justice Department" (http://www.scpr.org/news/2014/06/06/4457 3/justice-department-threatens-lawsuit-over-mental-h/). *Southern California Public Radio*. Retrieved 4 August 2015.

41. Faturechi, Robert (25 September 2011). "FBI probing reports of beatings in L.A. County jails" (http s://www.latimes.com/local/la-xpm-2011-sep-25-la-me-fbi-jails-20110925-story.html). *Los Angeles Times*. Retrieved 4 August 2015.

42. Solomon, Diana Beth (28 April 2015). "U.S. reaches anti-bias accord with Los Angeles County sheriff" (https://www.reuters.com/article/us-usa-police-losangeles-idUSKBN0NK03K20150429). *Reuters*. Retrieved 12 April 2020.

43. Robert Faturechi and Jack Leonard (9 December 2013). "18 Los Angeles sheriff's officials indicted, accused of abuse, obstruction" (https://www.latimes.com/local/lanow/la-me-ln-sheriff-indi cted-jail-misconduct-20131209-story.html). *Los Angeles Times*. Retrieved 4 August 2015.

44. Medina, Jennifer (9 December 2013). "U.S. Charges 18 Sheriff's Officers in Inquiry Into Misconduct at Los Angeles Jails" (https://www.nytimes.com/2013/12/10/us/18-charged-in-inquiry-i nto-los-angeles-sheriffs-office.html). *The New York Times*. Retrieved August 5, 2015.

45. Phillips, Erica E. (2 July 2014). "Six L.A. Sheriff's Officers Found Guilty of Obstructing Justice" (htt ps://www.wsj.com/articles/six-l-a-sheriffs-officers-found-guilty-of-obstructing-justice-1404260671). *Wall Street Journal*. Retrieved 4 August 2015.

46. "18 L.A. County deputies charged in civil rights corruption probe" (http://fox6now.com/2013/12/10/18-l-a-county-deputies-charged-in-civil-rights-corruption-probe/). *FOX6Now*. Retrieved 4 August 2015.

47. "L.A. sheriff's deputies, sergeant found guilty in jail beating" (https://www.cbsnews.com/news/los-angeles-sheriffs-deputies-sergeant-guilty-jail-beating/). *CBS News*. Associated Press. June 24, 2015. Retrieved 12 April 2020.

48. Rubin, Joel (24 June 2015). "Three L.A. County Deputies Convicted in Beating of Jail Visitor" (https://www.latimes.com/local/lanow/la-me-ln-three-la-deputies-convicted-in-jail-beating-case-201506 24-story.html). *Los Angeles Times*. Retrieved 12 April 2020.

49. Rubin, Joel (17 June 2015). "Ex-deputy: L.A. County sheriff's deputies beat jail visitor, then lied" (https://www.latimes.com/local/lanow/la-me-ln-sheriff-deputy-testimony-abuse-trial-20150617-story.h tml). *Los Angeles Times*. Retrieved 4 August 2015.

50. "Three Deputy Sheriffs Found Guilty of Federal Civil Rights Offense in Beating of Visitor at Downtown Los Angeles Jail" (https://www.justice.gov/usao-cdca/pr/three-deputy-sheriffs-found-gui lty-federal-civil-rights-offense-beating-visitor). *United States Department of Justice*. 25 June 2015. Retrieved 4 August 2015.

# External links

- Men's Central Jail (https://locator.lacounty.gov/lac/Location/3039766/los-angeles-county-sheriff---mens-central-jail), Los Angeles County Sheriff's Dept.

Retrieved from "https://en.wikipedia.org/w/index.php?title=Men%27s_Central_Jail&oldid=1240418116"



## Los Angeles Times

CALIFORNIA

# Oversight inspectors accuse Sheriff's Department of retaliation after reports on jail fires



In the decades since the L.A. County Men's Central Jail opened, inmates have regularly set fires for a variety of reasons. (Irfan Khan / Los Angeles Times)

**By Keri Blakinger**
Staff Writer

May 2, 2024 3 AM PT

Oversight commissioners have repeatedly accused the Los Angeles County Sheriff's Department of retaliating against inmates at Men's Central Jail after inspectors called

attention to the ongoing problem of fires burning unchecked inside the decrepit downtown lockup.

For years, inmates have been using batteries, razors, toilet paper and other items to set blazes when they want to cook food or heat water. But last summer, oversight inspectors — alarmed by three particularly large fires they'd witnessed — drew attention to the issue in commission reports and public meetings.

Afterward, a Times investigation found the problem stretched back several decades and was possible in part because the inmate housing areas in the aging facility have no sprinklers to douse blazes or blaring smoke detectors to prompt jailers to respond.

Then, in a move Sybil Brand Commission members Eric Miller and Mary Veral told The Times last month was "retaliatory," jail officials confiscated batteries that high-security inmates in isolation used to listen to their radios.

Inmates responded with a hunger strike that department officials said has since ended. The fires, however, have not.



CALIFORNIA

**In Men's Central Jail, fires are common, smoke alarms are not: Smells 'like a campfire'**

Sept. 27, 2023

"It still smelled like fires, but they're not doing anything about them — they're just taking away the batteries," Veral told The Times after a visit to the jail this week. "I'm pretty sure you can light fires other ways."

The Sheriff's Department did not deny the accusations of retaliation but told The Times that the battery-powered radios had only been available as part of a pilot program. The department did not explain how fires were set in the years before the pilot program

26

made battery-powered radios available to inmates. Officials are now exploring radio alternatives that do not require batteries, the department said.

"The safety of the inmates in our custody is our highest priority," the department said in a statement. "Regular searches are conducted in all inmate housing areas in an attempt to locate any outstanding batteries or other ignition sources."

Though the recent concerns about fires have brought the issue to the fore, blazes have been a problem in Los Angeles County lockups for more than a century. In 1921, the former county jail descended into an 18-hour riot after one man started a fire to heat his coffee and jailers responded by placing him in solitary confinement. That unrest helped prompt the construction of another jail; it was eventually condemned in part because the shortage of emergency exits made it a firetrap.

When Men's Central Jail opened in 1963, building codes still did not require automatic sprinklers or smoke detectors in any of the housing areas. Instead, the facility relied on a manually triggered alarm system, trusting the jail staff to spot fires and alert people. Though there have been some upgrades, jail officials previously told The Times that is largely how the system still works today.

In the decades since Men's Central Jail opened, inmates have regularly set fires for a variety of reasons. Several former inmates have told The Times that people use fires to cook their food, though sometimes they also use them to heat their water, stay warm or smoke cigarettes and drugs.

During an inspection by members of the Sybil Brand Commission in June, Veral said she spotted three large blazes on the second floor of the downtown facility. When she alerted jailers to the problem, Veral said, they shrugged and told her the inmates were cooking their canteen food and there wasn't much the guards could do about it.

27

Some lockups facing similar fire problems elsewhere have tried to tackle the issue by getting money for smoke detectors and more robust fire alarm systems. In Texas, a 2020 investigation by the Marshall Project, a nonprofit news site, found that the prison system had been violating state fire safety regulations for more than a decade and that men incarcerated there were regularly starting blazes to attract the attention of guards who they said ignored their needs.

After that reporting, the prison system more than tripled its spending on fire alarms. Before those installations were completed, further reporting found that several prisoners died in cell fires. This week, a prison spokeswoman confirmed that the state has again bumped up its fire safety spending to more than $13 million in 2024. She also confirmed to The Times that inmates in Texas are still allowed to have radios.

Yet Los Angeles has handled its fire hazards differently, as oversight inspectors detailed in a report last month.

"In June 2023 SBC commissioners witnessed fires in cells and brought the issue to the attention of [the L.A. County Sheriff's Department] in hopes they would take steps to ensure the safety of people incarcerated and working inside of Men's Central Jail," the report said. "LASD has not done anything to address the issue except to take away batteries from everyone incarcerated in the jail except a few people."

For the men living in isolation on the third floor — which is not the same floor where commissioners reported fires in June — the report said the radios "are one of the few things they can purchase to help with their mental health by providing music and entertainment while they are confined in their cell."

The report went on to question why department officials thought "prohibiting the purchase of batteries was the only possible response to the issue of fires," instead suggesting that officials consider more frequent inspections to determine the source of the fires.

At a public meeting last month, Miller described the move as "retaliation by the Sheriff's Department who, instead of ensuring that [inmates] get hot meals, have taken away batteries."

In responses to questions from The Times, the Sheriff's Department said its decision to take away batteries stemmed from the outcome of arson investigations that determined batteries had been the ignition point for recent fires on the third floor and elsewhere in the jail.

Officials also said the pilot program to allow inmates radio access — something that has been common in jails and prisons across the country for decades — started in 2017 and only expanded to the third floor this year.

The program was determined "not to be successful," in part because the "antiquated and unique physical layout" of Men's Central Jail "created challenges," the department said. "Nonetheless, these factors continue to be evaluated in our efforts to identify opportunities to expand services to our inmate population, in the safest manner possible."

## More to Read

**'Pendulum has swung': Supervisors signal shift on Men's Central Jail closure plan**

Aug. 5, 2024



**California's inmate firefighter crews are dwindling just as the state starts to burn**

July 9, 2024



**Inmate hung a noose. Jailers too busy watching 'explicit video' to intervene, inspectors say**

June 5, 2024





**Keri Blakinger**

Keri Blakinger covers the Los Angeles County Sheriff's Department. Before joining the Los Angeles Times in 2023, she spent nearly seven years in Texas, first covering criminal justice for the Houston Chronicle and then covering prisons for the Marshall Project. Blakinger was a 2024 Pulitzer Prize finalist in feature writing for For her insightful, humane portrait, reported with great difficulty, of men on Death Row in Texas who play clandestine games of "Dungeons & Dragons," countering their extreme isolation with elaborate fantasy. Her work has appeared everywhere from the BBC to the New York Daily News, from Vice to the Washington Post Magazine, where her 2019 reporting on women in jail helped earn a National Magazine Award. She is the author of "Corrections in Ink," a 2022 memoir about her time in prison.

Copyright © 2024, Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information

Case 2:24-cv-05716-SPG-AJR   Document 23   Filed 08/27/24   Page 31 of 51   Page ID
Case 2:75-cv-04111-DDP   Document 423   Filed 06/08/24   Page 2 of 9   Page ID
#:125
#:7776

CALIFORNIA

# Inmate hung a noose. Jailers too busy watching 'explicit video' to intervene, inspectors say



Inspectors at Men's Central Jail, shown in 2022, documented mold, mildew and inadequate food and water last month. They also found bugs coming out of the sinks, along with "small black worms." (Irfan Khan / Los Angeles Times)

By Keri Blakinger
Staff Writer

June 5, 2024 3 AM PT

When a pair of oversight inspectors walked up to one of the deputies' stations inside Men's Central Jail last month, they were already exasperated. During their visit to the

Case 2:24-cv-05716-SPG-AJR    Document 23    Filed 08/27/24    Page 32 of 51   Page ID
Case 2:75-cv-04111-DDP    Document 423 #:126 Filed 06/08/24    Page 3 of 9   Page ID
#:7777

high-security unit, the inspectors later wrote in their report, they'd been concerned to see a noose in one of the cells.

They were even more concerned when they realized a jailer had walked by for a safety check and ignored it.

The first time an inspector approached the deputies to tell them about it, he said, the eight jailers sitting in front of a television brushed him off. When he returned half an hour later with another inspector, he realized why: The deputies were busy watching a "sexually explicit" video, according to an oversight report published this month.

"The degree of callousness they were exhibiting was just horrific," said Eric Miller, one of the two Sybil Brand Commission inspectors who wrote the report. "What's the purpose of the security check if you're not actually taking any action?"

It was only after inspectors asked several deputies to intervene that one jailer finally tore down the noose before the inmate harmed himself, the report said.

To Haley Broder, the inspector who accompanied Miller that day, the failure to act seemed to be representative of larger problems she saw inside the decades-old facility.

"There was just continuous neglect and bad conditions," Broder told The Times this week. "People were saying they were hungry. We saw people with giant open wounds. The trash was just everywhere — there's so much trash. It smells. There are fires. And it seems in general there is just a genuine lack of interest in changing that situation."

In an emailed statement, the Los Angeles County Sheriff's Department said it has addressed several of the issues identified in the June report. Officials did not say whether the deputies caught watching the video have been reassigned but told The Times there is now an investigation underway.

Case 2:24-cv-05716-SPG-AJR    Document 23    Filed 08/27/24    Page 33 of 51    Page ID
#:127
Case 2:75-cv-04111-DDP    Document 423    Filed 06/08/24    Page 4 of 9    Page ID
#:7778

CALIFORNIA

### 6 inmates, 2 jailers hospitalized after 'toxic substance' exposure at women's jail in Lynwood

June 5, 2024

"The department investigates all allegations of misconduct and expects its personnel to perform its responsibilities in a professional manner in accordance with department policy," the statement said. "When violations of policy and procedures are discovered, personnel are held accountable."

The latest problems in the jail came to light after Miller and Broder visited for a surprise inspection in mid-May. When they entered the first-floor high-security unit, the inspectors stopped to talk to a man who'd been let out of his cell to shower. As they talked, Miller said, they watched a deputy walk down the row to look inside each cell for a safety check. A few minutes later, Broder said, she peeked into the open cell of the man who'd come out to shower.

That's when she spotted the noose.

"Though unlikely to support the incarcerated person's weight, the noose was obvious to anyone looking into the cell," she and Miller wrote in their report.

While Miller went to find a deputy, Broder — a trained social worker — stayed behind to talk to the apparently suicidal man in the shower, who had by then started banging his head against the wall.

At first, Miller said, he went to the deputies' station, where he found eight jailers seated in front of a television.

"The deputies said they would check on the cell later," the inspection report said, "but remained seated watching the video on the television."

Case 2:24-cv-05716-SPG-AJR    Document 23    Filed 08/27/24    Page 34 of 51    Page ID
#:128
Case 2:75-cv-04111-DDP    Document 423    Filed 06/08/24    Page 5 of 9    Page ID
#:7779

Eventually, Miller said, he tracked down the first deputy he'd spotted doing rounds, and convinced him to remove the noose.

After the commissioners finished inspecting the rest of the unit, they returned to discover the eight deputies were still sitting at their station watching a "sexually explicit video" on their television. When Miller walked in, he said, they didn't move to turn it off.

"To me it looked like the beginning of an OnlyFans video or something," Miller said. "It was women in underwear, and it certainly didn't look like they were going to put more clothes on. It looked like they were going to take them off."



CALIFORNIA

**Juvenile hall fight videos raise question: Can L.A. County probation reports be trusted?**

May 30, 2024

Officials did not respond to a question from The Times about what exactly the deputies were watching.

It was only when Broder walked in a few seconds after Miller that the deputies "hurriedly removed the video from the screen," the report said.

The report did not name the deputies involved.

The jails have long struggled to provide constitutionally adequate care and living conditions. The county is currently subject to four court-enforced settlement agreements stemming from federal lawsuits over poor treatment of inmates and bad living conditions.

Case 2:24-cv-05716-SPG-AJR    Document 23    Filed 08/27/24    Page 35 of 51    Page ID
#:129
Case 2:75-cv-04111-DDP    Document 423    Filed 06/08/24    Page 6 of 9    Page ID
#:7780

The newest of those settlements dates back to 2015 when — after a rise in jail suicides —
the U.S. Department of Justice took legal action against the county for failing to provide
adequate treatment for severely mentally ill inmates. The oldest of the cases is focused
on living conditions and dates back to the 1970s, but it still remains open because the
Sheriff's Department has never fully complied with the terms of the settlement.

"Men's Central Jail is a rolling settlement agreement violation," Miller said. "And no one
is willing to take responsibility."

Melissa Camacho concurred. She's an American Civil Liberties Union of Southern
California senior staff attorney representing inmates in two of the ongoing federal
lawsuits.

"Issues with safety checks and not notifying anyone that they saw a noose during a
safety check have to be clear violations of the consent decree in the DOJ case," she said.
"That case is focused on reducing the numbers of deaths by suicide, so to walk by a
noose is beyond the pale."

On that same floor of the jail, inspectors spotted several other problems. Some cells had
broken toilets or leaking pipes, and the housing areas were humid from the constant
drip of leaking showers, the report said. Inmates complained of rats and cockroaches in
their cells and food, and inspectors said they saw mildew on ceilings, showers and in
cells.

"There was also a man whose cell was covered in mold and water and he was using his
clothes to sop up the water," Broder said. "In that unit they don't have books, they don't
have pens. They have absolutely nothing, and it's completely dark."

On the fourth floor of the jail, inspectors wrote that some cells had no cold water, so the
inmates had rigged up a system to pass water from cell to cell using strings and plastic
bottles. There was a "strong smell of fire burning" and "trash everywhere."

Case 2:24-cv-05716-SPG-AJR   Document 23   Filed 08/27/24   Page 36 of 51   Page ID
#:130
Case 2:75-cv-04111-DDP   Document 423   Filed 06/08/24   Page 7 of 9   Page ID
#:7781

In multiple cells on that floor as well as on the first floor, the mattresses had chunks missing, an issue Camacho found particularly vexing. Over the last 50 years, the jails have repeatedly landed in legal trouble for failing to provide mattresses to all inmates, <u>forcing some to sleep on urine-soaked floors or chained to benches</u>.

"Having mattresses with chunks missing violates an order that has been in place since the 1970s," Camacho said. "It's assumed when the Sheriff's Department is ordered to give everybody a mattress it will be a complete mattress and not a partial mattress."

On the fifth floor, inspectors said, inmates were triple-bunked in a hot cell block where the air conditioners were filled with lint. There were bugs coming out of the sinks, the report said, along with "small black worms."

One person reported that there was "a sick inmate in the bunk above them whose defecation was falling into their bunk." The inmate told inspectors the deputies had ignored their requests to help the sick person.

In several housing areas throughout the jail, inspectors said, inmates complained there wasn't enough food, and the meals they did get were often cold or inedible. In one dorm, a man showed commissioners a carton of fully curdled milk he said he'd received that day. When inspectors talked to medical staff about it, one employee concurred that there "appeared to be insufficient food for the incarcerated people," <u>according to the report</u>.

In its statement, the Sheriff's Department did not address allegations about a lack of food but said that it had already resolved the cold water problem and that officials worked to have such issues "corrected as expeditiously as possible."

The department said that none of the inspectors reported a sick inmate during their visit, and that jail officials would contact the commission for further details. The

Case 2:24-cv-05716-SPG-AJR   Document 23   Filed 08/27/24   Page 37 of 51   Page ID
#:131
Case 2:75-cv-04111-DDP   Document 423   Filed 06/08/24   Page 8 of 9   Page ID
#:7782

department also said that its own inspection this week did not reveal any black worms, and that the jail maintains a contract with an exterminator.

"The Sheriff's Department often says they don't have enough staff," Camacho said. "What the Sybil Brand Commission tour shows is that it isn't that there isn't enough staff — it's that they don't do their job. And in this case, it's that they were watching porn instead of doing their job."

## More to Read

L.A. County deputy arrested for allegedly smuggling heroin into jail, sources say

May 7, 2024



Oversight inspectors accuse Sheriff's Department of retaliation after reports on jail fires

May 2, 2024



Why was 2023 such a deadly year in Los Angeles County jails? It depends on whom you ask

March 26, 2024



 Keri Blakinger

Keri Blakinger covers the Los Angeles County Sheriff's Department. Before joining the Los Angeles Times in 2023, she spent nearly seven years in Texas, first covering criminal justice for the Houston Chronicle and then covering prisons for the Marshall Project. Blakinger was a 2024 Pulitzer Prize finalist in feature writing for For her insightful, humane portrait, reported with great difficulty, of men on Death Row in Texas who play clandestine games of "Dungeons & Dragons," countering their

Case 2:24-cv-05716-SPG-AJR    Document 23    Filed 08/27/24    Page 38 of 51   Page ID
#:132
Case 2:75-cv-04111-DDP    Document 423    Filed 06/08/24    Page 9 of 9   Page ID
#:7783

extreme isolation with elaborate fantasy. Her work has appeared everywhere from the
BBC to the New York Daily News, from Vice to the Washington Post Magazine, where
her 2019 reporting on women in jail helped earn a National Magazine Award. She is
the author of "Corrections in Ink," a 2022 memoir about her time in prison.

Los Angeles Times

CALIFORNIA

# 'Pendulum has swung': Supervisors signal shift on Men's Central Jail closure plan



Built in the early 1960s, the now-decrepit Men's Central Jail has been a vexing issue for the county.  (Irfan Khan / Los Angeles Times)

**By Keri Blakinger and Rebecca Ellis**

Aug. 5, 2024 3 AM PT

In the summer of 2019, justice reformers celebrated because the Los Angeles County Board of Supervisors scrapped a controversial $1.7-billion plan to replace the county's oldest lockup — the dungeon-like Men's Central Jail on Bauchet Street — with a jail-like mental health facility.

Buoyed by a rising tide of prison reforms across the country, county leaders decided to focus instead on decreasing the jail population by creating more alternatives to incarceration. The new goal would be to close Men's Central Jail without building a replacement.

Five years later, there are roughly 5,000 fewer inmates — but Men's Central Jail is still open. And at the state level, the tides are changing, as voters are set to consider increasing the penalties for low-level theft and some drug crimes, both moves that could balloon the jail population.

Amid that backdrop, the board appears to be rethinking its no-new-jails strategy.



CALIFORNIA

**Your guide to Proposition 36: Stiffer penalties for some drug and theft crimes**

July 10, 2024

"The pendulum has swung," Supervisor Holly Mitchell said at Tuesday's board meeting. "We keep saying: When are you closing Men's Central Jail? I think there needs to be an 'and what are we building or creating for this population that perhaps pretrial, diversion, community settings won't match.'"

It's a question supervisors have been unwilling to entertain for the last five years, arguing they could shrink the jail population to zero without a new facility. But the board publicly changed its tone after Sheriff Robert Luna and his top jail official told them three-quarters of county inmates are facing charges too serious for diversion programs.

"I felt like we finally broke through the discussion of why it's needed and justification as to why it's needed, because numbers don't lie," said Supervisor Kathryn Barger in an interview. "A replacement has to take place."

What the county might replace the jail with — or where it would site a replacement — remains unclear.

To some justice reformers, the recent change of tone comes as a profound disappointment.

Claire Simonich, associate director of the nonprofit Vera California, questioned the department's claim that 75% of people in the jails couldn't be diverted, as well as the notion that a new facility would solve the problems currently plaguing the county's lockups.

"Men's Central Jail is decrepit," she said. "Building another jail won't address many of the problems and concerns that we see at Men's Central Jail — like overdose deaths, inhumane treatment and inadequate mental healthcare."

\*\*\*\*

When Men's Central Jail opened five decades ago, county leaders hoped the new capacity would end overcrowding and, in the process, improve worsening conditions in local lockups. Instead, the facility has given rise to federal lawsuits, aggressive deputy gangs, a sweeping scandal that landed a former sheriff in prison and a persistent string of complaints from inmates, oversight officials and community members.

But county leaders faltered in response. Three years after agreeing the county needed to build a new jail, the board in 2018 approved a $2.2-billion plan to do that — by tearing down the existing facility and replacing it with a rehabilitation-focused Consolidated Correctional Treatment Facility.



CALIFORNIA

**L.A. County to relocate some inmates, build jail to treat the mentally ill**

Aug. 11, 2015

The following year, the board changed course and instead greenlit a $1.7-billion project dubbed the Mental Health Treatment Center. Approved in a 3-2 vote, the planned facility would have been overseen primarily by the Department of Health Services instead of the Sheriff's Department, though a limited number of deputies would have provided security.

"It's still a jail," Supervisor Hilda Solis said at the time, opposing the plan. "It's still walls. It's still preventing people from having freedom, the possibility of even rehabilitation."

A few months later, the board scrapped the idea and started over, eventually embracing a "care first, jails last" philosophy paired with the goal of tearing down the decaying jail and not building a replacement. In 2021, the board approved an ambitious plan to decrease the number of people in custody by several thousand so the county could shut down the facility bit by bit before closing it completely.

But the planned closure date — in early 2023 — came and went, and the jail remains open. Last year, the board floated a motion outlining several recommendations to decrease the population but offering no concrete timeline for closure.



CALIFORNIA

**D.A. will not charge deputy seen on camera appearing to slam inmate's head into wall**

June 8, 2024

Meanwhile, conditions have not improved. The county is still grappling with several longstanding class-action lawsuits alleging abuse, poor conditions and inadequate mental healthcare behind bars. The jail death rate has risen sharply in recent years.

And this year, inspections by the county's Sybil Brand Commission have revealed mold, rats, fires, broken toilets, sink drains filled with "small black worms" and cells covered

42

in feces. In May, two inspectors found a large group of jailers watching a "sexually explicit" video instead of tending to a seemingly suicidal inmate who'd <u>hung a rudimentary cloth noose in his cell</u>.

****

The tenor of last week's board meeting signaled yet another change of direction in the county's response.

Though the agenda called for a discussion about the deteriorating conditions at Men's Central Jail, the conversation quickly shifted to plans for the facility's future.

Luna told supervisors he wasn't sure the county could ever decrease its incarcerated population enough to close Men's Central Jail without a replacement, in part because officials estimate so many inmates are facing charges that are too violent or serious for diversion programs. Instead, he suggested building what he called the "Care First Treatment Campus," which he said wouldn't necessarily be run by sheriff's deputies.

Barger, the board's lone Republican, seized on the suggestion as a path forward that could garner support from her more progressive counterparts.

"Men's Central Jail needs to be torn down no matter what," Barger said at the meeting. "The fact that it doesn't have to be a sheriff-run facility ... maybe you just opened up a new door in terms of finally doing something."

Solis, historically one of the loudest opponents of a new jail on the board, was adamant that, if another facility was built, it should not be in her <u>area</u>, which she said was already overwhelmed with carceral facilities, including Men's Central Jail and Twin Towers downtown.

"I don't want to see another jail built, obviously," she said. "But if the board goes that way, it better not be in my district."

Lindsey Horvath, the newest supervisor and one of the most progressive on the board, was skeptical of the concept and told The Times she wasn't "familiar enough" with Luna's vision to support it.

"I don't know of a facility that is run by a sheriff's department that is not considered a jail," she said in an interview.

****

The shift sparked swift pushback from justice reform advocates, community activists and some jail oversight officials.

"I was totally blindsided by that," said Anthony Arenas, an organizer with Justice LA, which has long opposed building any new jails. "It's just going to be Men's Central Jail under a new name — a 'Care First Treatment Campus' — which is even more disturbing given that this idea of 'care first, jails last' came from the community members who have advocated closing Men's Central Jail with no replacement."

During their Thursday morning meeting, members of the Sybil Brand Commission — a county oversight body that inspects local jails — panned the idea of a "care first" facility, saying "care first" is "not a thing" in the historically troubled culture of Los Angeles jails.

"This is not just a facility issue," commissioner Haley Broder told The Times afterward, highlighting examples of neglect and retaliation by jailers. "This is a culture issue."

And Peter Eliasberg, chief counsel at the American Civil Liberties Union of Southern California, rejected the core claim that started the discussion — the idea that three-quarters of the jail population can't be diverted or released pretrial.

"Nobody should be buying into that as a number that is solidly grounded," he said. The county's Office of Diversion and Reentry has successfully kept thousands of people — including some facing serious charges — out of the jails but has never been adequately funded, he said.

And a recent UCLA study found that Los Angeles courts are setting bail amounts far higher than the state average. Simply decreasing bail amounts, Eliasberg said, could help lower the jail population.

The assertion that most of the jail can't be diverted is "preposterous," he continued, adding: "If the board is thinking about making policy based on that statement, my father had a phrase he would say — 'You're leaning on a weak reed' — and I think that's entirely appropriate here."

## More to Read

**Some L.A. County supervisors say proposed expansion of the board is rushed**

July 9, 2024



**Opinion: California's budget deficit will force difficult cuts. This one should be the easiest**

April 30, 2024



**Editorial: Juvenile probation failures have left L.A.'s troubled kids nowhere to go**

April 8, 2024





**Keri Blakinger**



## Los Angeles Times

OPINION

# Editorial: A shiny new jail in L.A. is a bad idea, no matter what it's called



Men's Central Jail, shown in 2019. Los Angeles County leaders agreed that the jail should be demolished but have not determined how else to care for or supervise thousands of people after their arrests or convictions. (Al Seib / Los Angeles Times)

**By The Times Editorial Board**

Aug. 16, 2024 5 AM PT

There is no disagreement over the proper fate of Men's Central Jail in downtown Los Angeles. The decrepit facility must be torn down with all deliberate speed — just as soon

46

as county leaders make alternative arrangements for the thousands of people housed there at any given time.

And there's the rub. What do we do with everybody, especially the enormous percentage of people who landed in jail in part because of psychiatric or drug problems?

For years, the Board of Supervisors clung to the most rote and self-destructive answer: Build another jail, with a new name to imply a new mindset. It was going to be called the Consolidated Correctional Treatment Facility, then the Mental Health Treatment Center. The name being bandied about now is the Care First Treatment Campus.



OPINION

**Editorial: L.A.'s cruel and deadly jail is still full on shutdown date**

March 30, 2023

Yet all those fancy labels are just euphemisms for "jail." They all describe a single large, secure building, located on the footprint of Men's Central Jail, surrounded by other jails, and staffed by sheriff's deputies.

The board hears regular reports to monitor progress on closing the jail but does little to meet the various deadlines it sets, and then misses. During last month's report, Sheriff Robert Luna said that although deputies would be needed at a treatment campus, perhaps their role could be limited. The board was noncommittal, although some supervisors' comments could be interpreted as showing a renewed openness to a bad idea — a replacement jail.



OPINION

**Editorial: Jailed Angelenos die, deputies shrug. Will this daily routine never end?**

Oct. 24, 2023

We've been here before. One of those adjacent jails is Twin Towers, which sounds like it
ought to be an upscale condo development but is in fact a jail that has been cited and
sued almost as often as Men's Central next door. It became the county's 1990s version of
a treatment-oriented facility.

As the supervisors finally recognized in 2019, an even newer jail is not the answer,
because the problem is not merely a failing old building. The problem is that sheriff's
deputies are trained in policing, which is the wrong skill set and wrong approach for
rehabilitating people struggling with mental illness and addiction, whether or not those
people have been accused of crimes. Mental health professionals have testified
repeatedly that law enforcement techniques such as violent cell extractions commonly
worsen the patients' condition and undermine treatment.

Recent Los Angeles County history is littered with the evidence that law enforcement is
the wrong approach for psychiatric patients. For the first decade and a half of this
century, jailers routinely beat and abused inmates whose conditions they could not
understand. The Sheriff's Department failed so thoroughly at providing mental and
medical care that it had to hand over the responsibility to county health officials — yet
deputies still run the facilities and supervise the inmates, and overall care remains
abysmal.



OPINION

**Editorial: Start the demolition countdown at Men's Central Jail**

April 5, 2021

Just in the last year, jailers were caught watching porn on the job instead of monitoring
the people they are charged    with supervising and assisting. Twenty-one people have
died in L.A. County jails this year, 66 since the beginning of last year. Legal settlements
that were supposed to improve conditions include one that is nearly half a century old
and another that was signed this year, and many others in between.

48

To be sure, security for many mental patients is needed, particularly in the early stages of treatment. It's in no one's interest to allow the sick to wander off on their own. But locks do not by themselves turn treatment into jail as long as medical standards and practices prevail. Best practices for psychiatric treatment include "step-down beds," with higher acuity patients subject to the most security, proceeding over time to increasing levels of liberty as treatment and the patients' improvement allow.

To enable step-down care, patients should be treated close to their home communities, where most will eventually return. That means treatment should be provided at small facilities distributed around the county, not a single massive building in a jail complex.

OPINION

**Editorial: Men's Central Jail should be demolished. But what should replace it?**

Jan. 4, 2015

These principles — a network of small locked and unlocked step-down facilities, operated by medical professionals rather than law enforcement, with contract security as needed — have been part of the county's care-first plan for years now.

That plan is stuck in limbo in part because the population of Men's Central Jail remains too high — by about 4,000 people — to close the facility. But the population reduction that supervisors said was necessary to close Men's Central was always meant to come from the entire jail system. The county has already advanced toward that milestone with the help of successful county diversion programs that direct people away from or out of all county jails.



OPINION

**Editorial: Unconscionable abuse and shameful inaction at L.A. County jails**

May 7, 2023

49

The <u>Office of Diversion and Reentry</u>, for example, provides community housing and treatment for people deemed incompetent to stand trial who might otherwise sit in Twin Towers in the near-futile hope that their conditions will improve there. That's costly and foolish.

To expand their success, programs such as ODR need more beds in more communities. That's politically challenging for the Board of Supervisors because of the typical resistance from residents to these types of facilities. But the supervisors have moved forward with housing and treatment for homeless people whose profiles are often the same as many ill people currently in jail, except that they have managed to avoid arrest.

They need to keep at it if they are to fulfill their promise to close the dungeon that is Men's Central Jail and finally break the county's cycle of jailing and failing instead of treating and healing.

## More to Read

### 'Pendulum has swung': Supervisors signal shift on Men's Central Jail closure plan

Aug. 5, 2024



### Opinion: California's budget deficit will force difficult cuts. This one should be the easiest

April 30, 2024



### Editorial: Juvenile probation failures have left L.A.'s troubled kids nowhere to go

April 8, 2024



The Times Editorial Board

The Los Angeles Times' editorial board determines the positions of The Times as an institution. It operates separately from the newsroom. You can read more about the board's mission and its members at <u>About The Times Editorial Board</u>.

Copyright © 2024 Los Angeles Times | Terms of Service | Privacy Policy | CA Notice of Collection | Do Not Sell or Share My Personal Information